I just want to thank the parties for having filed a supplemental briefing with us to explain that the previously filed counterclaim for invalidity had been dismissed so that we had jurisdiction because in the case that we're about to hear, the parties didn't give us that information. The next case will be 07-1164, Furnace Brook v. Overstock.com. Mr. O'Connor. Yes, ma'am. Please, the court, let me apologize from the outset, Judge Clevenger. We put in the final judgment, which was obviously predicated on the fact that all- Right, but the docket sheet that you gave us showed that there were outstanding counterclaims. I apologize, Your Honor. We had to go to a pacer and pull down the stuff. I apologize, Your Honor. Thank you. This is an appeal from a grant of summary judgment of non-infringement below. And the grant was to the effect that the defendants did not infringe claims 1 and 5 of the 832 patent and claims depended therefrom. What I'd like to do is start with claim 5 of the 832 patent, specifically the limitation of customer terminal needs, which is the only limitation from claim 5 that the district court found absent in the accused's system. The first issue is whether that limitation is written in means plus function format. Now, there's no dispute between the parties that in 1995 the term terminal was defined as an electronic or electro-mechanical device for entering data into a computer or a communication system and displaying data received. And that definition can be found at page 71 of the appendix from the free online dictionary of computing. The only question, then, is whether that definition is as definite and detailed as the definition of the term baffle, which is the subject of this court's decision in the EnviroCard case. And in that case, baffle was defined by Webster's as a device, as a plate, wall, or screen to deflect, check, or regulate flow. Well, in light of the definition that apparently is undisputed by Overstock of the term terminal, terminal is, in fact, at least as definite as the term baffle and probably more so, which would take the limitation customer terminal needs. In the baffle case, was there any further discussion, further language in the need plus function limitation that shows structure? There was, Your Honor. In fact, there was a discussion. Is there here? No, there's not, Your Honor. Is there databases for distinguishing the two cases? No, Your Honor, because in EnviroCode, the court said that that definition alone was sufficient to take the limitation baffle means, second baffle means, out of the realm of means plus function, paragraph 6, section 112. The court did go on to discuss the other language, but it was apparent from the EnviroCode decision that even if that other language wasn't there, by virtue of the definition of the term baffle alone, second baffle means would not have been a means plus function limitation. In any event, it's clear from this court's precedent that language in claims is supposed to have meaning. One does not construe claims to render claim language superfluous. But in light of what the district court did below, in light of what Overstock is urging that this court do here, the language customer terminal would be rendered superfluous if, in fact, customer terminal is not found to be sufficiently definite to take customer terminal means out of the realm of paragraph 6, section 112. Because the claim scope simply wouldn't change in light of Overstock and the district court's view of what the claim construction should be, notwithstanding the fact that the language customer terminal is there. So we contend that in light of EnviroCode, in light of the fact that this language should not be rendered superfluous, customer terminal means should be construed as not means plus function. And what do you gain if you're right? The fact that we are entitled to look at all customer terminals as opposed to simply those terminals that are disclosed in the patent and the equivalence thereto. And we think in that circumstance, there would be no doubt that a computer or a cellular telephone at the customer end would be included in that definition. Therefore, there would be no question about infringement or at least the presence of that limitation in the accused's system. But we think the result, we end up with that result anyway, even if customer terminal means is written in means plus function format. In the first instance, what the court did below is it said, this is a means plus function limitation, and I'm going to construe it to be disembodied specifically. It did not, as a technical matter, include the language and equivalence thereto, which it was required to do. So from a pure statutory construction standpoint, we believe the court erred on that basis alone. And again, getting back to Judge Clevenger's question, the obvious implication there is we're entitled to a literal scope of that limitation that includes the equivalence to the embodiments taught. And again, that would include, at least in our view, personal computers at the customer end and cellular telephones. What's the Bellcore Mediacom system? That is a screen telephone that was offered for sale in the early 90s, Your Honor. I thought the system was software. I went and dug it out. This was actually introduced in 1994, Comdex 94. Bellcore officially launched its Mediacom software product line for installation on a personal computer. Well, there may very well be software that's disclosed in the patent. I mean, it's not a telephone. It's software. I'm sorry, Your Honor. I misspoke. There is a Nortel system that was the subject of discussion below and the subject of some great detail by the district court. The reason why I was asking why you were flogging the means plus function limitation as much as you were, I would have thought you said they had gone to the spec and said the Bellcore is software. You don't put software on an old telephone. You put it in a computer. Well, I think it may be unclear as to which end that software is used on, Your Honor. That may be the problem because it's clear from the specification that at the very least there is a computer and the embodiment is taught at the vendor's end of the system. Right, but my point is that Bellcore is disclosed as a preferred embodiment for this whole system. It says it's utilizable in accordance with this whole system. It can't be utilized without a computer. Software can't. If you take a disk and you put it on the table, it's not doing anything. True enough, Your Honor. In fact, that is consistent with what we believe to be the teachings of the specification in general. Well, let me pursue this. I understand the media comms system. It is, except for the fact that it's run through a computer off software, it is essentially a telephonic system as opposed to an internet-based system, correct? Yes. That one embodiment of the several that are described in the specification is for a screen telephone operating on a telephone line that interacts with a computer at the vendor's site. That's correct. Right, okay. Now, if this patent is read to be limited to telephonic-type communications, whether done through a computer or a cell phone or a portable phone or a traditional landline telephone with a dial-up, and not to include the internet, do you lose this case? No, Your Honor, because there are dial-up systems that require a telephone line from the customer's house to the central office. Oh, when you say dial-up system. Is there a, does Overstock, and Overstock's accused process include straight telephonic point-to-point communications as opposed to something that employs the internet? I understand, Your Honor. We don't believe there is any system that Overstock uses where the internet backbone is completely excluded. Okay. My point was that there is some segment of the communication system that for customers, certain customers, for example, that use dial-up systems, you need the telephone lines. But no, we don't believe there's any accused configuration in the Overstock system that wouldn't employ the internet at all. Okay, now while I've got you, let me ask you one other question. If you would turn to figure one of the patent. Yes. When you look at number 13, customer telephone terminal, to the right of number 13 is a figure, which struck me as a little bit of an unusual figure. What is that? It looks like a Y with some, an arm coming down. Frankly, Your Honor, I don't know. It looks a little bit like an antenna, or maybe it's not. Do you know what it is? I don't, Your Honor. I apologize. It obviously, I think, intends to show some sort of truncated version of the connection from the customer telephone. Could it be a telephone pole? I mean, it looks like it might be a telephone pole. It could be anything, Judge, frankly. But it's the standard electrical engineering figure, I take it. Not as far as I am aware. It is, as far as I can tell from looking at this figure and comparing it with other patent figures I've seen, this would tend to indicate that there are things left out. That it's a truncated depiction of that connection. Obviously, it's not a customer terminal that's connected directly through a single wire to a central office, for example. It has some things in the middle. That's pretty important. Well, it's important if that's the only embodiment the patent taught, Your Honor. But it's not. If we look at Figure 8, for example, we see another embodiment. It is not included in the District Court's definition. Not included in what Overstock Intensive Plan should be limited to. And we see in the upper left-hand corner the indication, Customer Terminal 81. And that is connected via customer communications, via telephone, mail, fax, and interactive media. So it's fairly clear that Figure 8 is not limited in whatever the fashion that Figure 1 looks like it may be limited. Well, mail surely is not encompassed within the meaning of customer terminal means, I would say. True. That is very true. So the fact that there is some reference to mail, at least, doesn't broaden the meaning of term. Well, it actually may, in light of whatever the telephone is the customer uses. If there's no capability of the customer and for interactivity on the telephone, per se, it may very well be the communications, for example, the marketing communications, that the vendors send to the customers via the mail, as opposed to Well, where does Figure 8 show that the customer is going to go on the internet? We contend, Your Honor, that interactive media, if that's not telephone and facsimile communications, interactive media would have to be some indication of a computer-to-computer or terminal-to-terminal system that would be akin to the internet. That's not a modem shown. Pardon? That modem is shown down here on the stuff that's over at the receiving end. True. And when you use a dial-up computer system, you are using a modem. When you connect to the internet from your home computer. But there's no modem shown up here in the telephone system. For the customer getting out, if you're saying what they're doing is doing a dial-up to get to the internet, I don't see how they're getting there. Other than perhaps through interactive media, whatever that means. Well, again, when you look at that teaching along with the teaching... But my point is, since the patentee knew how to show modems where he was using computers, which is down at the receiving end, I would have thought he had stuck a modem up here if he was trying to say that he was going to use the internet, he didn't have an interactive media modem. But that's the way that the district court looked at this. They said, well, customer terminal, since you're not talking about a computer, you're talking about a customer terminal, it can't mean a computer. Well, the point is, this particular limitation is broader than just a computer. So using the term computer here, using the term modem, would be unduly narrowing. The point is that this system can be used with a screen telephone, which wouldn't employ a modem. So to say that customer terminal element 81 here necessarily needs a modem would be unduly restrictive. If you have a computer that dialed a telephone number for you and made a telephone connection, we wouldn't have a modem. The point that I think Judge Bryson was raising was in essence to say, okay, let's assume for purposes of urgency that Judge Bryon erred in thinking that a computer or a cell phone, that if you use a computer or a cell phone, you were free from infringement. It couldn't possibly be a terminal. So just assume for purposes of argument, he was wrong about that, that you could telephone a cell phone or you could have a computer, it could be a terminal, customer terminal. But the problem is that if you're using it, it's wired up to get you to the Internet. As he describes, I believe, when he talks about the cell phone, a cell phone that is wired up to be able to get you to the Internet as opposed to one that's not. If you said, well, we read the whole patent, and there's nothing in the patent that suggests to us that the patentee was trying to make his connection between the customer and the catalog company, trying to make it any other way than through standard telephone technology as opposed to through the Internet. So it would be okay to use a cell phone or to use a computer to dial a telephone number to hook you up to the telephone line to have the transmission being done telephonically instead of Internetically. If I understand your question, Judge Clevenger, in essence what you're saying is, well, there's no mention of a way to connect to the Internet in the patent, and the word Internet doesn't appear there, and we agree. But these other embodiments must mean something. Otherwise, Figure 8, for example, is completely superfluous. If Figure 8 was only intended to show a standard telephone connection, then you wouldn't need it. It's showing it in more detail. It's adding a fax, for example, which is a form of telephone. And it also has something called interactive media. Well, it doesn't tell you what it is. But that term, just given its common understanding, interactive media is a broad term. And we contend that it defines, among other things, the Internet. The Internet is an interactive medium. And as far as whether the invention... Well, I just like your read. I mean, if the only indication in the patent that the invention was designed to include Internet communication as well as telephonic communication, and I'm going to hang it all on those two words, interactive media, that's kind of thin given the weight of the conversation in the spec about the fact that you're going to be dialing telephones. You'd have to grant it, I think, wouldn't you, that the bulk of the spec is describing telephone, me talking to you over a telephone line, not... When we do a quantitative look at the password, there's no doubt that the vast majority of it is discussing a telephone communication. But when we talk about paragraph 6, section 112, the literal scope of those kinds of limitations, the statute doesn't say that the only limitations or the only embodiments that could be included are those that are the majorly discussed ones and the ones that are in the minor fraction of the discussion are excluded from the literal scope. Can I just ask one question? I don't want to use the point of time. One question is the so-called opt-out limitation that's in both the means and in claim 1, and the debate seems to be whether or not the feature in the accused device that allows the customer to while on the Internet and while connected to click on an icon someplace to say, I don't want any newsletters. Yes. Is there any other feature on the accused device that would meet the limitation of those limitations? Well, there are different... Actually, this requires a rather detailed explanation. Let me see if I can show it. As best I can, Judge. There are several different features on the Overstock website, both on the computer and on the telephone, that allows customers to sign up for special updates. Some of them require checking a box. Some of them require typing in an e-mail address. So it's not the only one, the do you wish to receive e-mail updates. That's not the only one. There are other ways that customers can opt in and opt out of the various kinds of marketing... The opt-in and opt-out was focused expressly on consumer surveys or consumer studies of some sort, right? Not necessarily. Simply, if a customer buys something, he or she can indicate that he or she wants to receive e-mails about specials and sales. And... Let's leave it at that. Mr. Barr? It strikes me that in this hypothetical conversation with all this interactive and so forth and so on, I don't remember that the Internet was very interactive after the Money Heist. Well, that's a good point, Your Honor. In fact, I think the fact that this patent was filed in 1995 is significant here. And it's clear that this patent was one that was directed towards telephone technology and not towards the Internet. The Internet did exist back in 1995, but it wasn't mentioned anywhere in this patent, nor was it mentioned in any of the prior arts cited in the prosecution history for this patent. So it's clear here that the court was well-supported when it found that the Internet was not claiming this patent. Do you think that the court was claiming... was referring to the distinction between telephonic communications and Internet communication when he drew a line between telephones, including portable telephones, and computers and cell phones, on the other hand? There's obviously... The two sets of categories don't line up perfectly, but do you think that that's what the district court was in effect saying? This excludes the Internet, not this excludes all cell phones, for example, even ones used in a conventional fashion? I believe that the court... I believe the court did say that it excludes all cell phones. Do you think that's correct, or do you think that that was a misstatement of the sort that I'm suggesting? I think that it's absolutely correct. I think that it goes specifically to the court's construction of Claim 1, customer telephone terminal. I mean, sorry, telephone terminal. And specifically, the court there looked at the way that that term was defined, both in the claims and the specification and the prosecution history. And remember, instead of the claims in Claim 1, telephone terminal is defined specifically as a telephone-associated terminal screen. And then in Claim 1, it goes on to say that the telephone terminal... that the selected communication link is between the customer's telephone terminal and the retailer's computer. And that's the important thing here, which I think goes back to Judge Klobuchar's question. It's clear that this system does have a computer, but that computer is always on the retailer's side of the transaction. There's never... Let me ask you then about the media core, which is referenced in the patent as being within the scope, presumably, of what's claimed. That has a computer, I take it, because it's run off a computer. It uses computer functionality to perform what I understand it to be basically telephone protocol point-to-point communication. Is that correct? I think that's right. You may remember that there was no discussion, no evidence about what media core was. I understand. But I think you are correct that it was software that involved telephonic use. Right, but it also involved... It may not have involved the Internet, but it did involve a computer. That's perfectly clear. I believe it did involve a computer. So how does that not at least run afoul of Judge Bryant's distinction between computers, which are outside the scope of the claim, and telephones, which are inside? Because Judge Bryant did not say that computers were completely outside of the claims. He just said it was outside the scope of the claim for the device on the customer side of the transaction. Remember, we have a computer. But the media core... That's where you put media core. Yeah, that's a computer on the customer side. Well... If we're placing a telephone on the customer side, you go to your laptop, and it even tells you that it's compatible with Gates and with Apple. And when it introduces stuff, you just slip the disk in, and all of a sudden, your computer's a telephone. I'm not sure that the reference to media core, which was also referenced with the Nortel Vista 350, which is a screen phone like that right there, like the one you probably have on your desk in your office, I'm not sure that it's clear that that only relates to the customer side of the transaction. It's clear that the patentee in this case knew when to refer to a computer and knew when to refer to a telephone. The device on the customer side was always referenced as a telephone, whereas the device on the retailer side was always referred to as some type of a computer. If we should interpret Jerry Green's construction, whether it's interpreter or modify his construction, so that the telephonic type communications, that is telephone protocol point-to-point communications, are within the scope of the patent, whether performed by a computer or a cell phone or whatever, whereas internet type communications are excluded from the patent, would that change the outcome of this case, which is another way of saying, does your accused process involve, in any way, pure point-to-point communications, or does it invariably involve internet communications? Our process involves internet communications only, and it would not change the outcome of this case. Let me ask you one other question, by the way. Just for your reference, in column four, where you're describing both the Northern California Vista phone and Velcro media system, it describes them, and there are several commercially available screen phones in Florida, for example. The Velcro thing just came out five months before the patent was filed. Pretty fresh technology. What would you make of the term on figure eight, interactive media? And for that matter, while you're responding to that, you can also tell us, what do you make of the discussion, both in that figure and on column nine, of mail and fax? How does that fit into what the patent is addressing? Well, I don't think that there's anything about the term on figure eight to interactive media that suggests the internet. It's not defined. That term isn't defined anywhere. Well, how would you characterize it? Give me an example of something that falls within the scope of interactive media, but doesn't include the internet. Well, telephone, I guess, would be interactive. Well, they've already covered telephone. So they're saying telephone, mail, fax, and interactive media. So presumably, it's something other than telephone, mail, and fax. I don't know what else it would be, but there's certainly... There's nothing discussed in the specification or the prosecution history that would suggest that it is the internet. There's only two embodiments of this device that are discussed in the specification. One of those is the telephone terminal, and the other one is the telephone with the cable television system. So we have nothing that would suggest the internet. There's nothing in the patent that says how the internet would even work with this patent. Now, my second question, then, is on column nine, line 38 or so, the customer communications from Terminal 81 may take the form of telephone, mail, fax. What is the communication from a terminal, as you say the patent uses the term terminal, that is by mail? If we're using the term terminal to mean a telephone terminal, what is a mail from a terminal? It doesn't seem to fit. That's a good point. The significance here is that what we're talking about in Claim 1 is the telephone terminal, which is the term that's used throughout the patent. I think the word telephone terminal is used to refer to this device on the customer's side 32 times. There's three times when the word telephone is not used in some way to refer to what's on the customer's side, and that's three times when they refer to Customer Terminal 81, as you reference in Figure 8. Customer Terminal 81 involves international transactions, and it's not defined. That term, Customer Terminal 81, is not defined anywhere in the patent. I don't think that it necessarily has to be a telephone talking to a computer, when you're talking about an international transaction. In that time period, the interactive meeting would be a telex. It could have been a telex. That's how you communicate. It could have been a telex, but it's clear that there's no definition of Customer Terminal 81 anywhere in the specification. There's an attempt by... How do we know the 81 is international? I believe it's referenced in spec. I don't have the specific site to give you, but I think if you look at Figure 8, it talks about a Canadian... Let's see here. Yeah, there it is. If you look at Figure 8, there's a little dotted line across there that says Canada and USA right at the bottom. Well, the discussion at Column 9 of Figure 8 is to a combined domestic and international operation, and it seems to be picked up in Claim 8, at least most directly. All right. You've answered my question. It's important here to note that there was prosecution history to Sklink. There was a reference specifically in the prosecution history to the Hill 490 patent, which was a system that did utilize two computers, and that system was specifically argued against by the patentee, where they said that their system was different from the Hill system, and it was functionally and structurally different from Hill, and then that idea, that argument was accepted and picked up by the patent examiner, and the patent examiner carried that on into his comments. Now, there was a discussion by George about the Inverco case, and the Inverco case... I'm sorry, that's... Let me get back to where I was. You were talking about Hill and the distinction of Hill. Right. That's back to Elkay and the Salazar case, is what I meant to say. In the Elkay case, which is the same kind of facts that we have here, in Elkay, the examiner made a statement in direct response to an argument that was made by the patentee, and the court found that since the statement by the examiner was in a direct response to a comment made by the patentee, that the patentee's failure to object to that statement or to correct the examiner made the patentee stuck with that argument, and they were stuck with the examiner's interpretation. Ernest Brooks cited another case, the Salazar case, to try to get around the Elkay case, and it's important to note that Elkay and Salazar are different because in Salazar there was a completely unilateral statement by the examiner which was not made in response to any argument. The first time that the statement appeared in Salazar was actually in the notice of allowance, and so there the court found that they did not bind the patentee. We have a different situation in Elkay and a different situation here. Going back to the Enverco case, which dealt with the baffle argument, as the court noted, the Enverco court did say that baffle, the term baffle, did connote some structure. However, the court went on and did not hold that that alone was enough, that the fact that the word baffle connoted structure was not enough there. The court went back and talked about the specific statements that were in the specification, talking about the baffle, the formation of the baffle, and the location of the baffle, and those were really the significant points of the Enverco decision. We don't have that here. In regard to the customer terminal means argument, we don't have any type of a definition that is equivalent to baffle.  Their definition of terminal doesn't even support their argument because it talks about a device that's communicating with a computer or that it is displaying information from a computer. It's important to note here that we have, no matter how this comes out on the technology with the cell phone and with the Internet, or like the Internet, cell phone, and the computer, there's no question that that technology under the doctrine of equivalence is going to be held to be not in substantially different technology to the telephone that is used in the 832 patent, and that's why there is no doctrine of equivalence here, either if it's a means plus function claim and claim 5 or not. Do you understand the trial judge to have construed, when he construed the claims, to have allowed, at the summary judgment stage, a showing of equivalence, or did he foreclose at the claim construction stage a showing of 112.6 equivalence? Do you understand the question? It's a little involved. I think I do. I may be able to state more clearly, Christopher. It looked to me as if the judge was saying, in claim construction, this is limited to these particular disclosed embodiments, which is telephone, and to foreclose, at least possibly, the question of whether, as a matter of fact, it could later be shown at summary judgment or at trial, that other equivalence of those disclosed embodiments would be within the scope of the 112.6. Do you read the judge as having done that? I do not. And if not, where do you find support for the contrary view? Judge Prosser, I do not read that the judge did that. I think what the judge did is looked first to see what was disclosed and then looked at all of the evidence to see if there were any equivalents that were disclosed. But equivalents wouldn't be disclosed. Equivalents would be equivalents that aren't disclosed, by definition. Right. I mean whether there was any argument that the devices which were specifically identified at the claim construction portion could have been equivalents, such as Ernst Brook has argued that the term online suggests the internet, and the court rejected that argument. And so I don't think the court just said there is no chance that there could be any equivalents. I think what the court was saying was that the internet is not an equivalent here and that cell phones are not an equivalent here, and discuss the reasons for that. Can you point me to a particular place? I don't want to pin you down on a page and so forth. But I didn't see any such discussion by the court as such. But if you've got it, let me know. I don't want to hold you up. I can look. Well, that's all right. I'm sorry. I'm not. I understand. All right. Thank you. In any event, Your Honor, I think the only thing we haven't talked about is document equivalence infringement under Claim 5. And I believe the situation there, there's not going to be any document equivalence infringement because Ernst Brook would have to show that this is after-developed technology and is substantially different. There's no question that even if internet-enabled cell phones are actually after-developed technology, they're not going to be insubstantially different from the technology that's disclosed in the patent. So in summary, Ernst Brook is attempting to rewrite a 12-year-old telephone patent to cover the internet. This is foreclosed by the claims, by the specification, and by the prosecution history. And for these reasons, the district court's judgment should be affirmed. Thank you. Thank you. May it please the Court, I'd like to start with Judge Bryce's last question about what the district court did on paragraph 6, section 112, equivalence, because the district court did say something about it on page 826 of the record. He said that no reasonable juror could find an insubstantial difference between customer terminal means, a cellular telephone, or a personal computer. Now, when he did that, he ignored a bunch of evidence that was presented by Ernst Brook. First of all, the opinions of Dr. Nemes and Dr. Stephenson, our two experts, that a computer can be programmed to act like a telephone. Secondly, a prior video relied upon by Overstock's experts showing the known interchangeability between a standard telephone set and a personal computer in a system that Overstock alleged was prior art to the invention of the 832 patent. And finally, the opinions, again, of Dr. Nemes and Dr. Stephenson, that a cellular telephone is equivalent to a standard telephone set. So all this evidence was before the judge below, yet he said, look, these things aren't equivalent. Everyone knows it. For Overstock's part, below and here, it made the same statement without any support to the record. At their brief at page 36, they say that a computer and a cellular telephone are substantially different from the customer terminal means of Claim 5. No support. In their brief below, or in their statement of facts below, at 8177, paragraph 18, they make the same statement with the same omission to any citation to the record. So basically, the only evidence below, putting aside whether this is a means plus function limitation, whether the patent discloses the Internet or not, the only evidence below that for purposes of the literal scope of customer terminal means, the only evidence below was that the things that we're accusing of infringement are in fact equivalent to the structures disclosed in the 832 patent suit. Briefly on doctrine of equivalence. Overstock and the District Court only want to look at a single passage from the prosecution history. If we look at page 826 again, that's where the judge talks about the Hill reference and the passage from the prosecution history. That passage, when read in its entirety, describes Hill as a batch system. In other words, there was a master computer at the vendor site that sent information in batches to a customer site at the discretion of the vendor computer. That's not an online communication, which is what the subject of the claims are here, which is what Overstock's expertly did. Thank you very much.